**VUITTON ET FILS, S. A., Plaintiff,**

v.

**CROWN HANDBAGS, Defendant.**

**No. 78 Civ. 5001–CLB.**

United States District Court,
S. D. New York.

July 9, 1979.

J. Joseph Bainton, Marc E. Jaffe, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, for plaintiff.

Irving Heisler, Klein & Heisler, New York City, for defendant.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

By its action filed October 20, 1978, plaintiff ("Vuitton") seeks injunctive relief, damages· and treble damages,. and attorneys' fees for infringement of its registered trademark, in violation of the Lanham Trademark Act, 15 U.S.C. § 1051, *et seq.*, and for unfair competition and dilution of the distinctive quality of its goods in violation of § 368–d of the New York General Business Law. Subject matter jurisdiction of this Court is based upon 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1332, 1338 and pendent jurisdiction over the state law claim.

Plaintiff's motion for a preliminary injunction was consolidated with a trial on the merits pursuant to Rule 65(a)(2), F.R. Civ.P. The case was tried to the Court without a jury on February 7, 1979.

Plaintiff Vuitton is a *societe anonyme*, equivalent to a corporation, organized and existing under the laws of the Republic of France, with its principal place of business located at 78 bis Avenue Marceau, 75008 Paris. The company is engaged directly and through licensees or subcontractors, both here and abroad, in the manufacture and sale of high quality merchandise, including luggage, steamer trunks, garment bags, eyeglass cases, belts, wallets, jewelry cases and ladies' handbags. The latter are the subject of the claimed infringement.

Crown Handbags ("Crown"), the defendant in this action, is a New York corporation present in this District. It is a relatively new entity involved in the manufacture of genuine leather ladies' handbags and the wholesale distribution and sale of handbags of its own and other manufacture. Crown maintains a factory at 115 West 30th Street, and a wholesale store at 1196 Broadway, New York City.

Vuitton handbags are manufactured in France and also at 10 different plant locations within the United States, all by companies under license from the French company. The handbags are in turn sold directly, without the use of distributors or other middlemen, to a mere 44 retail stores nationwide. Only three of these, I. Magnin & Co., Neiman-Marcus Co. and Saks Fifth Avenue, are chain stores (Tr. p. 25). In New York City genuine Vuitton handbags may only be obtained at Saks Fifth Avenue and at Crouch & Fitzgerald, located at Madison Avenue and 48th Street (DX C).

The distribution of Vuitton handbags is strictly controlled to assure that genuine bags never move outside of this exclusive retail network. Defective bags are never allowed to enter the market at a reduced price. Factory seconds are returned to The French Company, at Covina, California, where they are destroyed (Tr. p. 35). Returns from retailers are rare in light of the fact that demand for the bags greatly exceeds their supply, but should returns be necessary they are accepted by Vuitton to limit further the possibility that genuine merchandise would enter the channels of trade at anything less than the full customary retail selling price.

Genuine Vuitton handbags bear the registered trademark of the Vuitton company, consisting of a distinctive pattern and arrangement of the initials LV superimposed upon one another surrounded by three designs derived from the fleur de lis, a traditional French symbol of Royalty. The trademark was first entered on the Principal Trademark Register of the United States Patent Office on September 20, 1932 and assigned the number 297,594, and renewed for an additional twenty year period on September 20, 1952 and again on September 20, 1972. The registration continues in full force and effect. Vuitton's trademark has also been recorded with the United States Department of the Treasury, United States Customs Service.

During more than 46 years of its use in this country, the Vuitton trademark has come to be recognized among customers and within the trade as identifying plaintiff's products and has earned a reputation of outstanding quality and craftsmanship. The handbags manufactured by Vuitton come in a variety of shapes, sizes and styles. They are constructed of heavy vinyl fabric over canvas or leather, with fine leather trim and brass hardware. The vinyl covering on the bags is dark brown, and provides the background for the mustard colored pattern of initials and designs. This color combination never varies from handbags to handbag and is part of the distinctive quality of the merchandise. The handbags crafted by Vuitton are relatively expensive. The two genuine handbags placed in evidence (PX 4 and 5) retail for $120.00 and $220.00, respectively.

The events which precipitated this lawsuit took place on October 11, 1978. During the afternoon of that date, Robert S. Cullen, a duly licensed private investigator associated with Bishops Service, Inc., who had personally concluded a number of other investigations for Vuitton, having been hired by plaintiff's law firm to help locate producers and distributors of counterfeit Vuitton handbags, entered defendant's business

premises at 1196 Broadway, New York City, posing as a customer. Cullen testified, and I find, that through a glass door, from a vantage point on the sidewalk outside the store, he observed two handbags bearing the Vuitton trademark hanging on a rack inside the business premises of Crown Handbags. Upon entering the store, Cullen inquired of the man behind the counter, whom he described in his written report (DX A) as "a male, white, Greek, approximately 35 years old, 175 pounds," if he could see one of the two bags which he had observed from the sidewalk. The man complied with his request and placed on the counter one of the two bags which Cullen identified at trial as being similar to plaintiff's Exhibit 2. The other handbag bearing the Vuitton trademark which Cullen identified at trial as being similar to plaintiff's Exhibit 3 remained hanging on the wall behind the counter. Cullen examined the bag placed before him on the counter and inquired as to its price. He was told that the bag cost $35.00, at which point Cullen offered to purchase the bag, but was informed by the man behind the counter that they only make sales in wholesale quantities, and he would have to purchase at least six bags. Cullen then asked how it would be possible for them to make a sale of six bags when he only saw two bags on display, to which the man replied that he had many more bags like them in inventory. The investigator thanked the salesman for his help and left the store without having purchased any of the alleged counterfeit bags. Cullen stated that while he was in the store he had observed two individuals within the store who appeared to be employees. One was the individual behind the counter, and the other was later identified by Cullen during his deposition as Kamil Homsi, the defendant's sole shareholder (DX B, p. 25). During cross examination, Cullen stated that he had been on the business premises of Crown Handbags a total of five minutes, two minutes of which he spent examining the alleged counterfeit bag.

Cullen testified that prior to his visit to defendant's wholesale outlet he had received instruction in the recognition of counterfeit Vuitton handbags. This training was received on the business premises of plaintiff's law firm, which Cullen visited on 10 to 15 different occasions during September 1978, where he was given the opportunity to examine between 300 and 400 counterfeit bags in a variety of styles, and make comparisons of them with genuine Vuitton handbags also on the premises. In addition, Cullen testified that he had visited both Saks and Crouch & Fitzgerald in a further effort to educate himself in the recognition of genuine Vuitton merchandise.

At trial, Cullen identified plaintiff's Exhibits 4 and 5 as genuine Vuitton handbags, and stated that after having examined the bags in defendant's store, he had concluded that the bags were counterfeit. Cullen cited a number of reasons for his conclusion that the bags were not genuine Vuitton products. These included the following: (1) genuine Vuitton merchandise may only be obtained at two retail stores in New York City: Saks Fifth Avenue and Crouch & Fitzgerald; (2) the price of $35/bag quoted to him was inordinately low for genuine Vuitton; (3) the zipper used on the bag was neither Talon nor Eclair, the only two types used on genuine Vuitton bags; (4) the stitching on the bag in defendant's store was done with cheap fiberglass thread, it was not the dark brown or bright white color customary for genuine Vuitton items, nor was it as close knit as that appearing on originals; (5) the workmanship of the bag in defendant's store was of generally poor quality; and (6) the vinyl used on the Crown bag was very light in contrast to the heavier vinyl used in the manufacture of genuine bags.

Kamil A. Homsi, defendant's sole shareholder was defendant's only witness. Homsi denied ever having either imitation or genuine Vuitton handbags on his business premises. While admitting that he sold vinyl coated handbags, some of which had the initials P, Q and G emblazoned on them, he denied ever having in his possession handbags similar to plaintiff's Exhibits 4 and 5

and bearing the Vuitton trademark. Homsi denied ever having seen Cullen before the commencement of this lawsuit, but Homsi stated that he was in his store on October 11, 1978, although not necessarily standing behind the counter.

After considering the circumstances under which each of these witnesses testified, and taking into account each witness' intelligence, motive and state of mind, as well as his demeanor and manner while on the stand and every matter in evidence which tends to show whether a witness is worthy of belief, I find that the events occurring on October 11, 1978 at defendant's business premises were essentially as Cullen described them in his testimony.

I find that there were at least six counterfeit Vuitton handbags on the business premises of Crown Handbags on October 11, 1978, and that an offer for their sale was made by a Crown employee to plaintiff's investigator.

The goal of the framers of the Lanham Trade-Mark Act was to secure to the owner of a trademark the goodwill of his business, and at the same time protect the buying public against spurious and falsely marked goods. *Application of E. I. DuPont DeNemours & Co.*, 476 F.2d 1357 (C.C.P.A. 1973). The Vuitton trademark has been used in connection with the advertising and sale of goods in commerce for over 46 years since its entry upon the Principal Trademark Register of the United States Patent Office in 1932. The trademark, # 297,594, specifically refers to "handbags and pocketbooks" as items to which the mark would be affixed (PX A to Complaint). Defendant makes no effort to challenge the validity or ownership of the Vuitton mark.

It remains to be determined whether defendant's actions in offering for sale copies of genuine Vuitton handbags were an infringement of plaintiff's registered mark within the meaning of 15 U.S.C. § 1114 which provides in pertinent part:

"1) Any person who shall, without the consent of the registrant—
(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation

of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided."

Where an alleged infringing mark is used in connection with the sale of similar goods, the long standing rule in this Circuit has been that the second comer to the marketplace "has a duty to so name and dress his product as to avoid all likelihood of consumers confusing it with the product of the first comer." *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758 (2d Cir. 1960). The second comer has no right to trade upon the good will of the first comer developed over a period of time and at considerable expense. As our Court of Appeals in this Circuit ruled many years ago in *Florence Mfg. Co. v. J. C. Dowd & Co.*, 178 F. 73, 75 (2d Cir. 1910):

"It is so easy for the honest business man, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of his competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them."

The great weight of the evidence in the case leads to the conclusion that the Vuitton trademark is a strong mark, and as such is entitled to broad protection. The strength of the mark stems from its conspicuously distinctive nature. It is unique in its design and color, and during the more than 46 years of its continuous use in this country it has come to represent a source of product of perceived quality and prestige. Furthermore, the Vuitton company has expended considerable effort in its desire to protect the exclusivity of the products

which bear its trademark. The method of distribution of Vuitton handbags has been detailed above. Its purpose is to protect the mark. Notwithstanding these efforts, a vast flood of counterfeit Vuitton merchandise, most of which has apparently come from abroad, is present in this District and elsewhere. Plaintiff has brought litigation against the infringers here and elsewhere, resulting in a number of lawsuits.

It would be impossible for one engaged in the same trade as plaintiff is, and defendant is so engaged, to be unaware of the presence of the counterfeits in the trade. Nor could such a person be unaware of the plaintiff's rights to its valued mark. I find that defendant was a wilful violator.

It cannot be disputed seriously that the handbags being offered for sale by defendant were designed and manufactured in a deliberate effort to duplicate the appearance of genuine Vuitton handbags, at a cheaper price. The likelihood of confusion between the counterfeit bags and the genuine article was convincingly demonstrated by the testimony of Emil M. Moos, a Senior Vice President at Saks Fifth Avenue, having over 25 years experience with Vuitton handbags. He testified that for the untrained eye it would be difficult, if not impossible, to delineate between an original handbag and a counterfeit, without a side by side comparison. My own examination and comparison of a number of known infringing articles obtained in related suits, with genuine merchandise, yields the same conclusion. I find that consumers without the experience of Mr. Moos, who are the majority of the consuming public, could easily be duped into buying the counterfeit handbags believing them to be genuine.

Both Vuitton and consumers in general would suffer by the purchase of counterfeit bags of inferior quality. Vuitton would soon lose its reputation for quality and exclusivity, and consumers would be deceived into believing they were getting something they were not.

■ Defendant clearly infringed upon plaintiff's registered trademark in violation of 15 U.S.C. § 1114, by offering for sale a combination of product and trademark which exactly mimics that of plaintiff, resulting in the type of confusion and deception which the Lanham Act was designed to prevent. In doing so, defendant acted wilfully and with knowledge of the fact that these handbags which it offered for sale infringed upon the trademark rights of plaintiff. Defendant was in the business of manufacturing leather handbags in New York. As noted earlier, logic dictates that it must be charged with actual as well as constructive knowledge of plaintiff's mark and merchandise. The counterfeit bags were manufactured with the intention to trade upon the plaintiff's established reputation for quality merchandise. Although defendant apparently did not itself manufacture the infringing articles, it took an active part in their distribution and sale, making use of plaintiff's trademark in the process.

■ Turning to the question whether defendant's actions amounted to the use of a false designation of origin or false description or representation of goods in commerce in violation of 15 U.S.C. § 1125(a), I conclude that defendant did violate that section as well. The statute provides in relevant part:

"(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation or origin or description or representation cause or procure the same to be transported or used in commerce or deliver to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any false description or representation."

The protection afforded by this statute is broader than that provided under 15 U.S.C. § 1114, in that it was enacted to protect consumers and competitors alike against all forms of misdescription or misrepresentation of products and services in commerce.

Clearly, the sale of imitation Vuitton handbags falls within the purview of the statute. The counterfeit Vuitton bags are by the very nature of their appearance a misrepresentation as to their origin. As has been mentioned, *supra*, the average consumer untrained in the recognition of genuine Vuitton merchandise could easily be misled into purchasing a handbag believing it to have originated with the French company.

There is no necessity to address the question whether or not the defendant has violated the General Business Law of New York State, § 368–d, also invoked by plaintiff. That the sales attempted here were "in commerce" cannot be disputed. See *Franchised Stores of N. Y., Inc. v. Winter*, 394 F.2d 664, 669 (2d Cir. 1968).

■ Plaintiff has established its entitlement to permanent injunctive relief from commercial practices violative of plaintiff's trademark rights. 15 U.S.C. § 1116. In this case there was no actual sale of the infringing merchandise, merely an offer for sale of six or more handbags. This in no way affects the issuance of an injunction, as the Lanham Act requires neither demonstration of actual consumer confusion stemming from the infringement, *Maternally Yours v. Your Maternity Shop, Inc.*, 234 F.2d 538 (2d Cir. 1958), nor actual injury to plaintiff resulting from a sale of the infringing article. The "mere possibility of such injury," clearly present here, is sufficient to warrant an injunction, *Monsanto Chemical Co. v. Perfect Fit Mfg. Co., Inc.*, 349 F.2d 389, 392 (2d Cir. 1965). It cannot be said here that there is no danger of further fraudulent commercial use by defendant of plaintiff's mark.

Defendant Crown Handbags and all its officers, agents, servants, employees, business representatives, their successors and assigns and others having notice shall be permanently enjoined from imitating, copying or making unauthorized use of Vuitton's Registered Trademark 297,594, and from making any unauthorized representation whatsoever, including but not limited to, the use of statements about or simulations, reproductions or imitations of Vuitton's Registered Trademark 297,594, which may lead the public to believe that any product handled by defendant is in any manner associated or connected with Vuitton.

■ Plaintiff also seeks three times its actual damages and an accounting for defendant's profits realized from the sale of the infringing handbags, as provided in § 1117. The awarding of profits is designed to be a deterrent to those who would wilfully infringe a competitor's mark. *W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir. 1970). Recovery for damages done to the plaintiff may serve as compensation for diverted sales or damage to its reputation, or other harm stemming from unfair competition. In a proper case the plaintiff may also be able to recover defendant's profits without demonstrating his own actual damages. *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 308 F.Supp. 489 (S.D.N.Y. 1969).

■ In all claims, however, plaintiff must demonstrate the basis for his recovery with specificity, thereby showing that injury or profitable infringement actually occurred. "[A] monetary award, whether in the form of damages or an accounting, is justified only to the extent that injury is shown already to have been suffered." *Monsanto Chemical Co., supra*, at 392. The discretionary award of either damages or profits assumes an evidentiary basis on which to rest such an award. Without such a basis there can be no recovery. *E. g., Caesar's World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269 (3rd Cir. 1975); *Field Enterprises Educational Corp. v. Cove Industries, Inc.*, 297 F.Supp. 989 (E.D.N.Y.1969); *cf. Fund of Funds, Ltd. v. First American Fund of Funds*, 274 F.Supp. 517 (S.D.N.Y. 1967).

The record is devoid of evidence demonstrating plaintiff's actual damages. For reasons which may be understandable, plaintiff has not disclosed its profit-margin on genuine bags. Although the genuine bags manufactured by Vuitton are of high quality, it is obvious to the Court that a part of the price represents a premium paid for the prestige apparently attached to owning this high fashion article which has Monsieur Vuitton's initials prominently placed thereon. While defendant's product dilutes the value of plaintiff's product in this prestige oriented high fashion market, it cannot be said that the sales which defendant secured directly compete with Vuitton, because one willing to pay the price for the genuine article would not buy the shoddy imitation article. It may be inferred also that those attracted to these shoddy imitation bags (of which many have turned up in other pending litigation in this Court), purchase simply because they cannot afford the genuine article.

Plaintiff argues that the entire gross revenues of Crown during the relevant period were $105,737.24, and should, in the absence of other evidence, be the amount of damages. This income, the evidence shows, was generated by a business which had approximately six employees engaged in manufacturing its own non-infringing leather handbags, and also sold the products of others. It is absurd to assume that this gross income was derived in any substantial degree from sale of counterfeit Vuitton merchandise. Plaintiff urges that because Crown did not go forward to establish what proportion of its gross revenues involved the unlawful sale of infringing merchandise, plaintiff should have judgment for the entire gross revenues for the relevant period. Defendant, however, denied that it had possessed or sold any counterfeit Vuitton merchandise, and according to its evidence, the percentage of its gross revenues derived therefrom was zero.

█ I find that defendant had in its possession on October 11, 1978 six of the counterfeit bags, which it was offering to sell at $35.00 a piece. There is no basis to conclude how many more than six it had. Since the bags were not produced, it is reasonable to infer that they must have been disposed of by sale to third parties at the asking price. The evidence justifies an inference, and I find, that Crown sold six such bags for a gross revenue of $210.00. The cost of such bags is a mystery which remains entirely within the knowledge of Crown, the defendant, as indeed is the source from which this unlawful merchandise was acquired. The interests of justice will be served by awarding damages to plaintiff in the amount of $210.00. See *Monsanto Chemical Co. v. Perfect Fit Products Manufacturing Co., Inc.*, 349 F.2d 389 (2d Cir. 1965).

█ Plaintiff also seeks to recover its legal expenses incurred in prosecuting this action. Congress amended the Lanham Act, § 1117(3), in 1975 by the addition of authority: "The court in exceptional cases may award reasonable attorney fees to the prevailing party." The Department of Commerce statement accompanying the Senate report on this amendment explained:

"Trademark and unfair competition cases brought under the Trademark Act of 1946 . . . present a particularly compelling need for attorney's fees . . . Deliberate and flagrant infringement of trademarks should particularly be discouraged in view of the public interest in the integrity of marks as a measure of quality of products. Effective enforcement of trademark rights is left to the trademark owners and they should, in the interest of preventing purchaser confusion, be encouraged to enforce trademark rights. It would be unconscionable not to provide a complete relief including attorney's fees . . . ."

The Senate Committee added that the "Department of Commerce believes and the Committee agrees that *the remedy should be available in exceptional cases, i. e., in infringement cases where the acts of infringement can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'*" Sen.Rep. No. 93–1400, 93rd Cong., 2d Sess. (1974), *reprinted in* (1974) U.S.Code Cong. and Admin.News pp. 7132, 7133, 7135 (emphasis added). The Report analogizes from the patent statute, 35 U.S.C. § 285,

which allows for attorney's fees in language identical to that used in § 1117 of the Trademark Act. The cases have interpreted the patent language in substantially the same way, that a deliberate or wilful violation makes the case "exceptional" and ripe for the award of attorney's fees, at the discretion of the Court. *Cf. Digitronics Corp. v. New York Racing Ass'n., Inc.*, 553 F.2d 740 (2d Cir.), *cert. denied sub nom. Amperex Electronic Corp. v. New York Racing Assn., Inc., et al.*, 434 U.S. 860, 98 S.Ct. 187, 54 L.Ed.2d 133 (1977).

█ Plaintiff is entitled, by this analysis, to reasonable attorneys' fees. There is undisputed evidence that plaintiff incurred legal expenses amounting to $2,234.50 as of February 7, 1979. Additional legal services were and will be required after that date through conclusion of this litigation in the district court. As a matter of discretion, the Court awards plaintiff attorneys' fees in the amount of $3,500, which is hereby found to be reasonable and necessary under the circumstances for all services rendered and to be rendered in this action in this Court.

The foregoing constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 52, F.R.Civ.P.