**LOUIS VUITTON S.A., Gucci Shops, Inc. and Fendi Paola N Sorelle SAS Company, Plaintiffs,**

v.

**SPENCER HANDBAGS CORP., Morris Rand, Pinny Rand and Arie Rand, Defendants.**

**No. 83 C 1742.**

United States District Court, E.D. New York.

Nov. 15, 1984.

Motion to Amend Judgment Denied Dec. 19, 1984.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City (J. Joseph Bainton, Susan L. Arinaga, New York City, of counsel), for plaintiffs.

Stanley A. Teitler, P.C., New York City (Stanley A. Teitler; Harvey Greene, Richard H. Levenson, New York City, of counsel), for defendants.

NICKERSON, District Judge.

Plaintiffs Louis Vuitton S.A. (Vuitton), Gucci Shops, Inc. (Gucci), and Fendi Paola N Sorelle SAS Company (Fendi), brought this action for an injunction and damages for trademark infringement and unfair competition in violation of federal and New York state law.

Vuitton is a French corporation, Gucci a New York corporation, and Fendi an Italian corporation. Defendant Spencer Handbags Corp. (Spencer) is a domestic corporation doing business at 141 Spencer Street, Brooklyn, New York. Defendant Morris Rand is a substantial owner and the operator of Spencer. Defendants Pinny Rand and Arie Rand are sons of Morris Rand and do business at 1627 48th Street, Brooklyn, New York, where all three Rands live.

Plaintiffs sought an injunction and damages pursuant to 15 U.S.C. §§ 1114, 1116, 1117 and 1125, New York General Business Law § 368–d and New York common law, claiming infringement of plaintiffs' trademarks, false designations of origin, false descriptions and unfair competition. The complaint alleged that defendants were offering handbags (virtually identical in appearance though not in quality to those of plaintiffs) imprinted with counterfeit copies of plaintiffs' trademarks. The court has jurisdiction under 28 U.S.C. §§ 1331 and 1338.

By order dated July 8, 1983, consented to by defendants, the court preliminarily enjoined them pending the trial from infringing plaintiffs' trademarks or using any false designation of origin or false description to lead people to believe defendants' products were associated with plaintiffs.

The case was tried to the court commencing October 23, 1984. The chief evidence offered by plaintiffs was a videotape showing a meeting held on April 21, 1983 in a room occupied by Melvin Weinberg in the Plaza Hotel in Manhattan. Weinberg had been retained by Vuitton to assist it in its efforts to protect its trademarks. He had made contact with David Rochman, a distributor of counterfeit handbags including those purporting to be Vuitton bags. Weinberg had represented to Rochman that he was going to obtain manufacturing facilities that would make large numbers of counterfeit Vuitton bags and promised that Rochman could become a partner in the business and one of its few distributors. Rochman agreed to bring the Rands to the hotel room to discuss Weinberg's supplying them with bags that they had previously received from Rochman.

Weinberg arranged, without the knowledge of the Rands or Rochman, to videotape the meeting. The tape shows that the three defendants, Rochman, Weinberg and his assistant Gunnar Askelman attended. The Rands' remarks revealed that they were highly knowledgeable about the counterfeit bag business and were intent on impressing Weinberg with their business acumen. They repeatedly stressed that they were anxious to build up a large stock of counterfeit Vuitton merchandise, that they paid their suppliers promptly without giving them any trouble, and that they took many precautions to avoid getting caught. They told Weinberg that they never sold to stores in New York but only to loyal "wholesalers" and "hustlers" who would

never implicate the Rands. To shield themselves the Rands often took deliveries directly from Rochman's van into their own van and then transported the goods to a well-protected warehouse. The Rands demonstrated their telephone answering device complete with beeper that prevented callers from discovering who or where the Rands were.

The tape records, among other things, the Rands stating the following. They had been in business with Rochman for eighteen months. They agreed with Rochman that they had been ordering some 800 to 1,000 counterfeit Vuitton bags per week. On each bag they made a profit of $3.00 to $3.50. They had paid or owed Rochman substantial sums of money for those bags. More specifically, Pinny Rand said that he sent Rochman about $8,000 per week. They were eager to receive from Weinberg large numbers of counterfeit Vuitton bags and were well able to pay for them.

They had also been selling counterfeit Gucci and Fendi bags. Pinny Rand said that up until eight months previously he had been doing as much business selling Gucci bags as he had selling Vuitton bags, but that Gucci bags were then harder to sell. He said that he had ordered 3,000 pieces of Fendi goods from Rochman during the week of April 21, 1983.

The tape shows Arie Rand handing over to Pinny Rand some wads of cash that Pinny Rand gave to Rochman in payment for counterfeit Vuitton goods. The tape does not reveal the amount of the cash. From Pinny Rand's statements on the tape the amount appears to have been $13,608.

Plaintiffs offered credible evidence of specific shipments of counterfeit Vuitton merchandise to defendants. On April 14, 1983, Robert Pariseault, a manufacturer of counterfeit Vuitton goods, shipped a total of 720 cosmetic cases, shoppers and satchels to defendants at 1627 48th Street, Brooklyn, New York, on the orders of Rochman. The invoice for this shipment was $10,016, which Rochman received from plaintiffs. Plaintiffs also proved another, and smaller, shipment by Pariseault of

counterfeit Vuitton tote bags to defendants on January 14, 1983 at the same address, delivered by United Parcel Service (UPS). The invoice on this shipment was for $466.80.

Plaintiffs offered into evidence records of UPS for Borsetta Handbags, Inc. (Borsetta) from October 25, 1982 through October 3, 1983. Borsetta manufactured counterfeit Vuitton bags. The UPS records showed that over the year Borsetta shipped a total of 313 pounds of handbags to the Rands' address at 1627 48th Street in Brooklyn.

The defendants testified that their statements recorded on the tape were untrue. Their version was as follows. Rochman (with whom they had been doing a legitimate handbag business since August or September of 1982) asked them to do him a favor by telling Weinberg falsely they had been doing a large business with Rochman in counterfeit Vuitton bags. Rochman asked them to do this in order to impress Weinberg and induce him to enter into some unrelated large business deal with Rochman. They agreed because they hoped to get more credit, better service and further loyalty in their legitimate bag business from Rochman. They never sold a single counterfeit Vuitton bag or any other counterfeit bag. Rochman gave them the cash that Pinny Rand handed back to Rochman at the meeting. Rochman had notified Pinny Rand that someone would deliver to them at 1627 48th Street, Brooklyn, the boxes referred to in the invoices of Pariseault, but defendants never opened the boxes and never sold any of their contents.

■ The testimony of defendants is unworthy of belief. The court finds that defendants did in fact sell large quantities of counterfeit Vuitton bags and also sold counterfeit Gucci and Fendi bags. Plaintiffs are entitled to a permanent injunction. Vuitton and Gucci are entitled to money judgments.

■ The amount of Vuitton's and Gucci's recovery is governed by 15 U.S.C. § 1117. That section provides, in pertinent

part, that when a violation of any registered trademark has been established the plaintiff shall be entitled to recover "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." In assessing profits the plaintiff is required to prove "defendant's sales only" and defendant must prove "all elements of cost or deduction claimed." In assessing damages the court may enter judgment "for any sum above the amount found as actual damages, not exceeding three times such amount," and that the court, if it finds the amount of recovery "based on profits" to be "inadequate or excessive," may "in its discretion enter judgment for such sum as the court shall find to be just." In "exceptional cases" the court may award reasonable attorneys' fees to the prevailing party.

Since defendants denied that they sold any infringing bags and produced no records, plaintiffs were forced to prove defendants' profits by the only evidence available, namely, their admissions on the tape. At the meeting defendants stated that they had been doing business with Rochman in counterfeit Vuitton bags for a period of eighteen months. They agreed with Rochman when he said they ordered between 800 and 1,000 such bags per week. While defendants' appearance on the tape gives the impression that they were speaking with candor, it is possible that in order to interest Weinberg to do business with them they tended to exaggerate the number of bags they sold per week. Moreover, since defendants did not affirmatively state that they ordered this quantity of bags per week but only agreed with Rochman's statement, the court declines to adopt this figure in assessing profits.

■ Pinny Rand stated that he sent Rochman $8,000 every week for counterfeit Vuitton bags. He also said that for each satchel that cost them $18 they made a profit of $3. Using these figures to determine the Rands' profit ratio, the court finds that for the $8,000 worth of merchandise purchased from Rochman per week the Rands cleared a profit of $1,333.33. Plain-

tiffs claim that they should receive profits for 75 weeks (based on a 50-week work year for eighteen months). The court concludes that the credible evidence shows that defendants made $1,333.33 in profits per week for 75 weeks or a total of $99,-999.75 selling counterfeit Vuittons. The court determines that this amount of recovery is neither inadequate nor excessive. *See* 15 U.S.C. § 1117.

The Rands said on the tape that until eight months before April of 1983 counterfeit Gucci items sold by them used to be equal to counterfeit Vuitton items. The court takes this to mean that the profit on both types of bags was equal. The court thus finds that for 41.67 weeks defendants made $1,333.33 in profit per week selling counterfeit Gucci merchandise for a total of $55,559.86. The court determines that this amount of recovery is neither inadequate nor excessive. *See* 15 U.S.C. § 1117.

Pinny Rand said he continued to buy, and presumably sell, one counterfeit Gucci model at the time the videotape was made. However, the tape revealed no evidence as to what profits defendants made on that model. The court cannot award profits without any evidentiary basis on which to rest such an award. *See Vuitton et Fils, S.A. v. Crown Handbags,* 492 F.Supp. 1071, 1077 (S.D.N.Y.1979), *aff'd,* 622 F.2d 577 (2d Cir.1980).

■ Plaintiffs have not satisfied their burden of proving either damages or profits as to Fendi. While defendants said on the videotape that they had ordered 3,000 pieces of Fendi merchandise during the week of April 21, 1983, there is no evidence as to whether that merchandise was ever received or sold by defendants. Nor did the Rands make any statements as to the costs or resale price of counterfeit Fendi goods. Fendi may not take a money judgment.

The method the court used to compute defendants' profits is somewhat less than precise. However, where defendants have denied selling any infringing items and produced no records to aid in assessing profits, "the wrongdoer shall bear the risk of the

uncertainty which his own wrong has created." *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 90 L.Ed. 652 (1946). *See also Deering, Milliken & Co. v. Gilbert,* 269 F.2d 191, 193–94 (2d Cir.1959); *Chesa Int'l, Ltd. v. Fashion Associates, Inc.,* 425 F.Supp. 234, 238 (S.D. N.Y.) (when a party frustrates proof of profits or damages courts should resolve any doubts about actual assessment of profits or damages against that party), *aff'd,* 573 F.2d 1288 (2d Cir.1977).

■ The court finds that defendants' infringement was willful and that they committed perjury. The court deems this an exceptional case requiring an award of reasonable attorneys' fees. *See, e.g., Quaker State Oil Refining Corp. v. Kooltone, Inc.,* 649 F.2d 94, 95 (2d Cir.1981); *Vuitton et Fils, S.A. v. Crown Handbags,* 492 F.Supp. at 1078–79. The court finds the amount of $8,000 to be reasonable. Plaintiffs may also have costs.

■ The plaintiffs may have judgment against Morris Rand, Pinny Rand and Arie Rand. Morris Rand made many statements about his involvement with his sons' business. Moreover, he stated that none of his sons made a decision about orders from Rochman without asking him first. However, the evidence on the tape does not show that Spencer manufactured, repaired or sold counterfeit handbags. While Morris Rand complained about the quality of some of the counterfeit merchandise the Rands received, he said only that he paid for the items anyway because, as a manufacturer, he understood the problems of another manufacturer. Morris Rand said that Spencer did no manufacturing of counterfeit bags because he was afraid he'd get caught if he were engaged in such a visible operation.

■ Defendants ask the court to draw an inference adverse to plaintiffs because they did not call Rochman as a witness. Plaintiffs respond that the inference should be drawn against defendants. On October 22, 1984, the day prior to the commencement of the trial, Stanley A. Teitler, the attorney for defendants, stated to the court that Rochman had "agreed" to testify that "all of the statements" made by defendants during the course of the taped meeting were untrue and were made at Rochman's request "in order to puff up the situation." Mr. Teitler said that Rochman was then in Hong Kong on business and believed before he left, "based upon statements made to him by counsel," that the trial date would be adjourned. Mr. Teitler asked if the court would grant a continuance after completion of the other evidence in the case until Rochman returned to testify. The court said that it would observe the tape when it was introduced and then decide whether to permit the taking of Rochman's testimony over the telephone.

The next day, October 23, 1984, before the trial started, Mr. Teitler stated to the court that Rochman, who had "no motive to lie" and "would corroborate the testimony of the defendants," was not in Hong Kong but in Korea and "not locatable." Mr. Teitler renewed his application for a continuance for the testimony of Rochman. The court reserved decision.

At the end of the first day of trial Mr. Teitler again raised the question of taking Rochman's testimony. Harvey Greene, who had been counsel of record for defendants and was assisting Mr. Teitler at the trial, said he had been informed that Rochman had been brought from Korea to Arizona as a result of an "emergency," and that he was about to undergo a double hernia operation. The court then directed the attorneys to find out when Rochman would be available and said that the court would take his testimony over the telephone or in person when he was available.

The following day, October 24, 1984, J. Joseph Bainton, the attorney for plaintiffs, delivered a letter to the court with copies to defendants' attorney and to Allen Bickart, a Phoenix attorney, stating that Bickart had informed Mr. Bainton that Rochman had been operated on for a hernia and that he might be expected to be available at the Scottsdale Memorial Hospital to testify

that day by telephone should either party or the court so desire.

When the trial resumed on the afternoon of October 24, 1984, Mr. Bainton informed the court that subsequent to sending his letter he had received a telephone call from Rochman's brother-in-law, a Mr. DeCastle, who had also been Rochman's partner in the business of distributing handbags both counterfeit and genuine. Mr. Bainton reported that DeCastle said he was very concerned because the defendants were harassing Rochman "to get him to tell this court things that were not true" and that DeCastle confirmed that he and Rochman had shipped to defendants counterfeit Vuitton bags, although he could not testify to the quantity. Mr. Bainton said that both Rochman and DeCastle were available to talk to the court by telephone.

The court then directed Mr. Bainton to give the information to the United States Attorney to make such investigation as he saw fit.

Neither party then saw fit to obtain the testimony of either Rochman or DeCastle, neither of whom had been previously deposed. Under the circumstances the court will draw no inference for or against either party because of the failure to present Rochman's testimony.

The foregoing constitutes the court's findings of fact and conclusions of law. The plaintiffs may have judgment in accordance with this memorandum and order. Submit judgment. So ordered.

## ON MOTION TO AMEND JUDGMENT

This is an action for trademark counterfeiting under the Lanham Act. 15 U.S.C. § 1051 et seq. After a bench trial, the court issued its findings of fact and conclusions of law in a memorandum and order dated November 15, 1984, familiarity with which is assumed. The court awarded plaintiffs injunctive relief under section 1116 and profits under section 1117. Before the clerk of the court entered judgment, plaintiffs submitted a memorandum in the form of a letter that asked the court to apply a newly enacted statute retroactively and amend the award of profits. The court treats that letter as a motion to amend the judgment under Rule 59(e) of the Federal Rules of Civil Procedure. Defendants oppose the motion also by memorandum in the form of a letter.

When this action began, 15 U.S.C. § 1117 provided that as one remedy for trademark infringement plaintiffs could recover the amount of defendant's profits. If the court found that amount "either inadequate or excessive" to compensate plaintiffs, the court could in its discretion enter judgment for a sum the court found to be just.

The Trademark Counterfeiting Act of 1984 (the Act) amended section 1117 just before this case went to trial. Pub.L. No. 98–473, Ch. XV, 98 Stat. 1837, 2178 (1984). Effective October 12, 1984, that section provides that in assessing damages, "the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages" when it finds that defendants "intentionally" used a mark "knowing" it to be counterfeit. *Id.* § 1503(2)(B) (to be codified at 15 U.S.C. § 1117(b)).

The case was tried to the court starting on October 23, 1984. In their post-trial briefs, plaintiffs stated, and defendants did not dispute, that the earlier version of section 1117 controlled this case. The court determined that defendants wilfully sold items bearing counterfeits of plaintiffs' trademarks. The court awarded profits under the old section 1117 but declined to treble them finding that the amount was not inadequate. Plaintiffs now say, contrary to their position in their post-trial brief, that the court should apply section 1117(b) retroactively and treble the profits.

Almost two centuries ago the Supreme Court established the general rule that a new statute is presumed to operate prospectively unless Congress clearly expresses a contrary intention. *See, e.g., United States v. Heth,* 7 U.S. (3 Cranch) 399, 2 L.Ed. 479 (1806). The purpose of this rule was to prevent "the assigning of a quality or effect to acts or conduct which they did

not have or did not contemplate when they were performed." *Union Pacific R.R. Co. v. Laramie Stock Yards Co.*, 231 U.S. 190, 199, 34 S.Ct. 101, 102, 58 L.Ed. 179 (1913).

The Court recently adopted a different presumption. In *Bradley v. School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974), the Court held that a court must apply the law in effect at the time it renders its decision, even if the new law does not expressly recite that it is to be applied retroactively. *See also Thorpe v. Housing Authority*, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969). Thus, for cases not yet filed, cases pending, and cases on direct review when a statute is enacted, that statute is presumed to operate retroactively. This presumption "may be displaced either by a fair indication that the statute, properly construed, has only prospective effect or by resulting injustice from a retroactive application." *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 746 F.2d 168, 174 (2d Cir.1984). *See Bradley*, 416 U.S. at 711, 94 S.Ct. at 2016. In "mere private cases between individuals," a court must "struggle hard against a construction which will, by retrospective operation, affect the rights of parties." *Bradley*, 416 U.S. at 712, 94 S.Ct. at 2016 (quoting *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801).

■ The words of section 1117(b) offer little guidance as to whether Congress contemplated its retroactive application. The court thus looks to the legislative history to determine whether Congress' purpose would be furthered by such application. Congress found that trademark counterfeiting injures both consumers and manufacturers economically and poses a threat to public health and safety. *See, e.g.*, S.Rep. No. 526, 98th Cong., 2d Sess. 1–5 (1984). In order to stop what Congress regarded as a counterfeiting epidemic, the Act imposes criminal penalties, and provides for *ex parte* seizures of counterfeit goods and mandatory treble damages or profits.

The mandatory treble damages provision serves two purposes: inducement and deterrence. *See* S.Rep. No. 526, *supra*, at 6. Because federal prosecutors lack the resources to bring criminal charges against more than a fraction of trademark counterfeiters, civil suits are necessary to enforce the Act. *Id.* The mandatory treble damages provision is thus designed to encourage private victims to vindicate "both their rights and the public interest in accurate trademark information." *Id.* While this provision may induce more trademark owners in the future to bring suits, plaintiffs with suits already pending on the effective date of section 1117(b) obviously need no such inducement. Applying the statute retroactively cannot therefore further this purpose. *Cf. Litton*, 746 F.2d at 175 (denying retroactive application of statute increasing rate of post-judgment interest).

This case is distinguishable from the *Bradley* case which permitted the retroactive application of a statute providing for attorneys' fees in school desegregation cases in order to induce plaintiffs to bring suits for injunctive relief. In deciding to award attorneys' fees under the new statute the Court considered, among other factors, that defendant's resources were "formidable" as compared to plaintiffs', *id.*, 416 U.S. at 718 & n. 25, 94 S.Ct. at 2019 & n. 25, that the plaintiffs were a class of children and defendant was a "publicly funded governmental entity," *id.* at 718, 94 S.Ct. at 2019, and that desegregation litigation is of a "kind different from 'mere private cases between individuals,'" *id.*, since school desegregation is a "national policy of high priority." *Id.* at 719 n. 27, 94 S.Ct. at 2020 n. 27. None of these considerations applies to this commercial litigation in which the plaintiffs are three wealthy international corporations and defendants are private individuals.

Congress also provided mandatory treble damages to "deter those who might otherwise engage" in trademark counterfeiting by "taking the profit out of this lawless behavior." S.Rep. No. 526, *supra*, at 6. To increase the deterrent effect, the treble damage award in section 1117(b) is not designed to compensate plaintiffs but rath-

er to punish defendants. The House and Senate sponsors of the Act said that the sentence in the old section 1117 that reads damages " 'shall constitute compensation and not a penalty' is inapplicable in counterfeiting cases, since one of the purposes of treble damage awards" is to "provide an adequate penalty for such conduct." 130 Cong.Rec. H12083 (daily ed. Oct. 10, 1984) (joint statement intended as authoritative explanation of the legislative intent). *See also* S.Rep. No. 526, *supra*, at 6 (treble damages provision is form of punitive damages).

Retroactive application of section 1117(b) cannot further the purpose of specific deterrence. Conduct that has already ceased, such as defendants' conduct here, cannot be specifically deterred by retroactive application of the statute since deterrence operates prospectively only. While applying this statute retroactively would serve the purpose of general deterrence, so too would the retroactive application of every statute. The court concludes that Congress did not intend to apply these penalties retroactively to further the sole purpose of general deterrence. *Cf. Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976) (Court would "hesitate to approve the retrospective imposition of liability on any theory of deterrence" where prior law imposed no liability.).

A further consideration counsels against construing 1117(b) to operate retroactively. A "cardinal principle" of statutory construction requires courts to construe statutes, if fairly possible, in a manner that avoids the need to resolve difficult and sensitive questions of constitutional law. *See, e.g., United States v. Security Industrial Bank*, 459 U.S. 407, 103 S.Ct. 407, 412, 414, 74 L.Ed.2d 235 (1982). If section 1117(b) must be construed to apply retroactively, this court would have to determine whether the statute runs afoul of either the *ex post facto* clause, U.S. Const. art. I, § 9, cl. 3; art. I, § 10, cl. 1, or the due process clause of the fifth amendment.

The *ex post facto* clause prohibits laws that impose punishment for acts not punishable when committed or that impose greater disadvantages upon the offender than those imposed when the act was committed. *Weaver v. Graham*, 450 U.S. 24, 28–29, 101 S.Ct. 960, 963–964, 67 L.Ed.2d 17 (1981). While the prohibition traditionally applies to criminal statutes, it may also apply to civil penalties that are really criminal penalties in disguise. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 595, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952) (citing *Burgess v. Salmon*, 97 U.S. (7 Otto) 381, 385, 24 L.Ed. 1104). *See also Flemming v. Nestor*, 363 U.S. 603, 612–621, 80 S.Ct. 1367, 1373–1378, 4 L.Ed.2d 1435 (1960) (analyzing whether Congress designed statute terminating social security benefits to deported aliens as punishment in order to determine if its retroactive application violated *ex post facto* clause). The due process clause prohibits retrospective civil legislation that results in especially " 'harsh and oppressive' " consequences. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92 (1976) (quoting *Welch v. Henry*, 305 U.S. 134, 147, 59 S.Ct. 121, 126, 83 L.Ed. 87 (1938)).

Congress designed section 1117(b)'s mandatory treble damages provision primarily to punish counterfeiters rather than to compensate victims of counterfeiting. *See supra*, at 6. While the statute is civil in form, it is closely akin to a penal law in substance. This creates a substantial doubt that its retroactive application would comport with the prohibition against *ex post facto* laws or the requirements of due process. The court need not, however, decide these issues because the statute may fairly be construed to operate prospectively only. *See United States v. Security Industrial Bank*, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982) (declining to construe statute to operate retroactively to avoid having to resolve whether such application violates takings clause of fifth amendment).

The *Bradley* case, while creating a presumption in favor of retroactivity, does not

purport "to hold that courts must always thus apply new laws to pending cases in the absence of clear legislative direction to the contrary." *Bradley*, 416 U.S. at 715, 94 S.Ct. at 2018. "Determination of retroactivity remains a matter of statutory construction." *Litton*, 746 F.2d at 174. The court finds that the purposes of the mandatory treble damages provision in section 1117(b) would not be furthered by construing it to apply retroactively. Plaintiffs' motion is denied. Submit judgment in accordance with the court's order dated November 15, 1984. So ordered.