LOUIS VUITTON S.A., Gucci Shops, Inc., and Fendi Paola N Sorelle SAS Company, Plaintiffs-Appellants, Cross-Appellees,

v.

SPENCER HANDBAGS CORP., Morris Rand, Pinny Rand and Arie Rand, Defendants,

Spencer Handbags Corp., Defendant-Appellee,

Morris Rand, Pinny Rand and Arie Rand, Defendants-Appellees, Cross-Appellants.

Nos. 1038, 1090, Dockets 85-7066, 85-7094.

United States Court of Appeals, Second Circuit.

Argued April 17, 1985.

Decided June 26, 1985.

J. Joseph Bainton, New York City (Susan L. Arinaga, Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City, of counsel), for plaintiffs-appellants.

Stanley A. Teitler, New York City (Amy Adelson, Richard H. Levenson, New York City, of counsel), for defendants-appellees.

Before OAKES, MESKILL and PIERCE, Circuit Judges.

MESKILL, Circuit Judge.

This appeal presents for the first time the question of the retroactivity of the treble damages provisions of the new Trademark Counterfeiting Act of 1984, Pub.L. No. 98–473, Ch. XV, § 1503(2)(B), 98 Stat. 2178, 2182, (to be codified at 15 U.S.C. § 1117(b)) (Act). The United States District Court for the Eastern District of New York, Nickerson, J., ruled that the objectives of the Act would not be served by retroactive application of the treble damages requirement and that prospective application of the Act would avoid potential constitutional concerns. 597 F.Supp. 1186, 1192–95 (E.D.N.Y.1984). We agree. We also find no merit in defendants' cross-appeal.

BACKGROUND

Plaintiffs are Louis Vuitton S.A. (Vuitton), a French corporation, Gucci Shops, Inc. (Gucci), a New York corporation, and Fendi Paola N Sorelle SAS Company (Fendi), an Italian corporation. These firms manufacture a variety of products, including handbags, that are distributed through high quality retail sales outlets in the United States. Defendants are Spencer Handbags Corporation (Spencer) and Morris, Pinny and Arie Rand. Morris Rand operates and substantially owns Spencer, a handbag manufacturer located in Brooklyn, New York. Pinny and Arie Rand, Morris' sons, operate a wholesale handbag business out of the basement of the family home in Brooklyn.

Plaintiffs filed suit in the United States District Court for the Eastern District of New York alleging trademark infringement, false designation of origin, false descriptions, unfair competition, injury to business reputation and dilution of trademark quality. 15 U.S.C. §§ 1114, 1125 (1982); New York Gen.Bus.Law § 368-d (McKinney 1984). They sought an injunction pursuant to 15 U.S.C. § 1116 (1982) and damages, fees and costs pursuant to 15 U.S.C. § 1117 (1982).

With defendants' consent, the court issued a preliminary injunction. By its terms, defendants were prohibited from infringing plaintiffs' trademarks, using any false designation of origin or false description to suggest that defendants' goods were connected with plaintiffs, or engaging in any other activity constituting an interference with plaintiffs' rights in their trademarks.

The bench trial began on October 23, 1984. Plaintiffs' case was based primarily on a videotape of a meeting in the Plaza Hotel between the Rands, their distributor David Rochman, Melvin Weinberg and an associate of Weinberg's. Weinberg was hired by Vuitton's attorney to investigate various trademark counterfeiting schemes. In this investigation, Weinberg played the undercover role of "Mel West," a casino owner interested in funding a scheme involving the manufacture and distribution of counterfeit trademarked goods. Weinberg, as "West," contacted Rochman, whom Weinberg knew as a distributor of counterfeit bags. Weinberg told Rochman that he was planning to manufacture counterfeit Vuitton bags and that Rochman could be a partner in, and a distributor for, this operation. Rochman arranged to take the Rands, with whom he had been conducting business for some eighteen months, to Weinberg's hotel room where the meeting was covertly videotaped. The district court described the events revealed on the tape as follows:

The Rands' remarks revealed that they were highly knowledgeable about the counterfeit bag business and were intent on impressing Weinberg with their business acumen. They repeatedly stressed that they were anxious to build up a large stock of counterfeit Vuitton merchandise, that they paid their suppliers promptly without giving them any trouble, and that they took many precautions to avoid getting caught. They told Weinberg that they never sold to stores in

New York but only to loyal "wholesalers" and "hustlers" who would never implicate the Rands. To shield themselves the Rands often took deliveries directly from Rochman's van into their own van and then transported the goods to a well-protected warehouse. The Rands demonstrated their telephone answering device complete with beeper that prevented callers from discovering who or where the Rands were.

The tape records, among other things, the Rands stating the following. They had been in business with Rochman for eighteen months. They agreed with Rochman that they had been ordering some 800 to 1,000 counterfeit Vuitton bags per week. On each bag they made a profit of $3.00 to $3.50. They had paid or owed Rochman substantial sums of money for those bags. More specifically, Pinny Rand said that he sent Rochman about $8,000 per week. They were eager to receive from Weinberg large numbers of counterfeit Vuitton bags and were well able to pay for them.

They had also been selling counterfeit Gucci and Fendi bags. Pinny Rand said that up until eight months previously he had been doing as much business selling Gucci bags as he had selling Vuitton bags, but that Gucci bags were then harder to sell. He said that he had ordered 3,000 pieces of Fendi goods from Rochman during the week of April 21, 1983.

The tape shows Arie Rand handing over to Pinny Rand some wads of cash that Pinny Rand gave to Rochman in payment for counterfeit Vuitton goods. The tape does not reveal the amount of the cash. From Pinny Rand's statements on the tape the amount appears to have been $13,608.

597 F.Supp. at 1188–89.

Not surprisingly, defendants argued that the events disclosed on the tape were not as they appeared. The Rands testified that their conduct on the tape was an act, performed to help Rochman impress "West."

Defendants insisted that the cash exchange was staged; Pinny Rand testified that Rochman had given him several bundles of bills with instructions to return them to Rochman in "West's" presence, representing the cash as payment for handbags. He also testified that the documented shipments of counterfeit handbags were delivered to the Rands' address only at Rochman's insistence and that defendants neither opened the boxes nor sold the handbags.

The district court found defendants' version of the story incredible. 597 F.Supp. at 1189. The court issued a permanent injunction and awarded profits, damages and costs to Vuitton and Gucci pursuant to 15 U.S.C. § 1117.

In determining the amount of damages, the court relied on defendants' statements on the videotape, noting that defendants' failure to produce any records made this reliance necessary. Pinny Rand stated that he paid Rochman $8,000 per week for counterfeit Vuitton bags and that he made a profit of $3.00 on each $18 bag. The court calculated the Rands' weekly profit on Vuitton bags at $1,333.33 and multiplied that amount by seventy-five weeks to cover the eighteen month duration of defendants' relationship with Rochman. Thus, Vuitton's total profit recovery was $99,999.75.

Gucci's recovery was calculated using the same weekly profit ratio, multiplied by 41.67, based on defendants' statements that until eight months before April 1983, profits in counterfeit Guccis had been equal to that in counterfeit Vuittons. The court thus awarded Gucci $55,559.86. The court found the awards of damages for Vuitton and Gucci to be neither inadequate nor excessive. 597 F.Supp. at 1190; 15 U.S.C. § 1117. Ruling that plaintiff Fendi had not proved either damages or profits, the court declined to award any monetary judgment to Fendi. The court also concluded that "defendants' infringement was willful and that they committed perjury." 597 F.Supp. at 1191. Thus, the court awarded plaintiffs $8,000 in attorneys' fees, plus costs.

After the court's opinion was released but before judgment was entered by the court clerk, plaintiffs wrote a letter asking the court to amend its judgment by applying the mandatory treble damages provision of the new Act, § 1503(2)(B), which was enacted eleven days before the start of the trial. Under the old Act, an award of treble damages was discretionary. 15 U.S.C. § 1117. Treating the letter as a motion to amend the judgment under Fed.R.Civ.P. 59(e), the court denied plaintiffs' request in a subsequent opinion. 597 F.Supp. at 1192–95.

The court noted that in an earlier post-trial brief filed prior to their motion to amend the judgment, plaintiffs had argued that the court should, in accordance with the pre-amendment Act, exercise its discretion to award treble damages. That brief reflected plaintiffs' belief that the amendment providing for mandatory treble damages awards should not be applied to this case because the suit was filed before the amendment was in effect. In considering the motion to amend the judgment, the court found plaintiffs' change of position unpersuasive.

The district court relied on the Supreme Court's general statement that "a court is to apply the law in effect at the time it renders its decision" in the absence of manifest injustice or evidence of legislative intent to the contrary. *Bradley v. School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974). Finding the words of the new Act barren of any indication of Congress' views on retroactive application, the court examined the legislative history, which revealed that the new provision was intended both to induce the filing of suits by private victims and to deter potential counterfeiters. Determining that neither objective would be served by retroactive application, the court refused to award treble damages.

Moreover, the court noted that potential constitutional problems would be avoided if the statute were construed to have only prospective effect. 597 F.Supp. at 1194. Because the punitive nature of the treble damages provision could implicate *ex post facto* or due process concerns if the Act were applied retroactively, the court chose the construction that would avoid the constitutional issues. Therefore, it denied plaintiffs' motion and ordered that judgment enter as directed earlier. This appeal followed.

## DISCUSSION

Vuitton and Gucci appeal the district court's denial of their motion for treble damages. Defendants cross-appeal, contending, *inter alia*, that the damage award was improper because it was not based on sufficient evidence and that the videotape should not have been admitted because it was not properly authenticated.[1]

### A. *Trademark Counterfeiting Act*

The Trademark Counterfeiting Act of 1984 was enacted as part of the Continuing Appropriations, 1985—Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, 98 Stat. 1837 (1984). Section 1503(2)(B) of the Act, 98 Stat. 2182, amended 15 U.S.C. § 1117. Section 1117, the general trademark recovery provision, states in pertinent part: "In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." Section 1117 also provides for the assessment of profits and states that the total award "shall constitute compensation and not a penalty."

The amendment, which applies specifically to counterfeiting cases, states in pertinent part:

---

1. Defendants also argue that they were improperly prevented from examining the nature of the relationship between plaintiffs' counsel and the government, a contention that we find meritless.

In assessing damages under subsection (a) of this section, the court shall, unless the court finds extenuating circumstances, enter judgment for three times such profits or damages, whichever is greater, together with a reasonable attorney's fee, in the case of any violation ... that consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark ..., in connection with the sale, offering for sale, or distribution of goods or services.

Trademark Counterfeiting Act § 1503(2)(B).

Plaintiffs urge reversal of the district court's decision on several grounds. We believe that the implication of constitutional concerns provides the most important basis for our affirmance; therefore, we proceed directly to that issue.

■ When interpreting a statute, courts have long applied the " 'cardinal principle' " that a fair construction which permits the court to avoid constitutional questions will be adopted. *United States v. Security Industrial Bank,* 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982) (quoting *Lorillard v. Pons,* 434 U.S. 575, 577, 98 S.Ct. 866, 868, 55 L.Ed.2d 40 (1978)); *Lowe v. S.E.C.,* — U.S. —, —, 105 S.Ct. 2557, 2562, 86 L.Ed.2d 130 (1985). Where a statute may be construed to have either retrospective or prospective effect, a court will choose to apply the statute prospectively if constitutional problems can thereby be avoided. *In re Ashe,* 712 F.2d 864, 865–66 (3d Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1279, 79 L.Ed.2d 683 (1984); *Roth v. Pritikin,* 710 F.2d 934, 939–40 (2d Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 394, 78 L.Ed.2d 377 (1983). Resolution of the constitutional issue need not be certain; there need only be a "substantial doubt," *Security Industrial Bank,* 459 U.S. at 78, 103 S.Ct. at 412, or an indication that the constitutional question is "non-frivolous." *Ashe,* 712 F.2d at 865. *Accord Roth,* 710 F.2d at 939 ("[e]ven the spectre of a constitutional issue" is sufficient to construe the statute to provide for only prospective relief).

■ Retroactive application of the treble damages provision could raise constitutional questions concerning both the *Ex Post Facto* Clause, U.S. Const., art. I, § 9, cl. 3, and the Due Process Clause of the Fifth Amendment; we therefore select the construction that renders constitutional analysis unnecessary. We point out that we do not, and need not, decide the constitutional questions; we need only determine that the *ex post facto* and due process questions are sufficiently serious to persuade us to choose the construction that avoids the constitutional issues. *Security Industrial Bank,* 459 U.S. at 74, 103 S.Ct. at 410.

In mandating the award of treble damages in trademark counterfeiting cases, Congress intended both to penalize known counterfeiters, thereby deterring others, and to induce private victims to protect the public interest by vindicating their rights. S.Rep. No. 526, 98th Cong., 2nd Sess. 1, 6, *reprinted in* 1984 U.S.Code Cong. & Ad. News 3627, 3632 [hereinafter S.Rep.]. In their official explanation of legislative intent, the bill's congressional sponsors stated:

The provisions of subsection (a) remain applicable in counterfeiting cases except insofar as they are inconsistent with subsection (b). Thus, the sentence of section 1117 that reads "Such sum ... shall constitute compensation and not a penalty" is inapplicable in counterfeiting cases, since one of the purposes of treble damage awards for intentional dealing in known counterfeits is to provide an adequate penalty for such conduct.

Joint Statement on Trademark Counterfeiting Legislation, H.R.J. Res. 648, 98th Cong., 2nd Sess., 130 Cong.Rec. H12076, H12083 (daily ed. Oct. 10, 1984). *See also* S.Rep. at 6, 1984 U.S.Code Cong. & Ad. News at 3632. Thus, it is clear that Congress intended the Act's effect to be punitive rather than compensatory.

■ The *Ex Post Facto* Clause prohibits the enactment of laws that either impose punishment for acts not punishable at the time they were committed or increase

punishment over that previously prescribed. *Weaver v. Graham,* 450 U.S. 24, 28, 101 S.Ct. 960, 963, 67 L.Ed.2d 17 (1981). If a statute "changes the legal consequences of acts completed before its effective date," *id.* at 31, it may run afoul of the *Ex Post Facto* Clause. Although the prohibition generally applies to criminal statutes, it may also be applied in civil cases where the civil disabilities disguise criminal penalties. *See Harisiades v. Shaughnessy,* 342 U.S. 580, 595, 72 S.Ct. 512, 521, 96 L.Ed. 586 (1952); *see also DeVeau v. Braisted,* 363 U.S. 144, 160, 80 S.Ct. 1146, 1154, 4 L.Ed.2d 1109 (1960) (plurality opinion of Frankfurter, J.) ("The mark of an *ex post facto* law is the imposition of what can fairly be designated punishment for past acts.").

It is not unreasonable for defendants to suggest that the new punitive treble damages provision, if applied retroactively, would present a potential *ex post facto* problem. The possibility of such a problem is not ameliorated by the prior discretionary treble damages provision. As demonstrated by the statement of the legislative sponsors, section 1503(2)(B) is intended to penalize counterfeiters as a means of deterence. Section 1117, prior to its amendment, by contrast, was intended only to compensate victims of trademark violators. That section permits the court, in its discretion, to "enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." This equitable power to provide complete compensation is quite different from the new mandatory trebling which must occur in counterfeiting cases. We do not decide that retroactive application of this statute would violate the *ex post facto* prohibition, only that it would raise the issue. Therefore, we see exclusively prospective application as the better course.

Retroactive application of the treble damages provision might also implicate the Due Process Clause of the Fifth Amendment. As the district court observed, due process generally does not permit retrospective application of statutes that cause especially "harsh and oppressive" consequences. *See United States Trust Co. v. New Jersey,* 431 U.S. 1, 17 n. 13, 97 S.Ct. 1505, 1515 n. 13, 52 L.Ed.2d 92 (1977) (quoting *Welch v. Henry,* 305 U.S. 134, 147, 59 S.Ct. 121, 126, 83 L.Ed. 87 (1938)). *See also Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 17, 96 S.Ct. 2882, 2893, 49 L.Ed.2d 752 (1976) ("The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process...."). As we did above, we refrain here from concluding that the Due Process Clause would be violated by retrospective application. However, the presence of this concern supports our preference for strictly prospective application. We affirm the district court's denial of plaintiff's motion to amend the judgment.[2]

### B. *Damage Award*

■ Defendants, in their cross-appeal, argue that the court's award of damages was based on insufficient evidence. They insist that the court's reliance on the Rands' statements on the videotape for proof of the amount of damages was improper. We affirm the judgment of the district court because we do not believe that the court's findings on the amount of damages were clearly erroneous. *See Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Manufacturing, Inc.,* 597 F.2d 71, 75–76 (5th Cir.1979). The court observed that defendants denied selling any counterfeit items and refused to produce any records. In that circumstance, the court noted, defendants must bear the burden of uncertainty. 597 F.Supp. at 1190–91 (citing *Bigelow v. RKO Radio Pictures, Inc.,* 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652 (1946)).

---

**2.** The district court concentrated primarily on *Bradley v. School Board,* 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476 (1974). Although we emphasize the canon of construction that prohibits unnecessary consideration of constitutional questions, we agree with the court's evaluation of *Bradley's* impact on this case and its conclusion that the legislative history demonstrates that Congress intended that the Act be applied only prospectively.

Recovery under section 1117 is not limited to cases in which the quantum of actual damages is demonstrated. Rather, plaintiffs may recover profits reaped by the defendants from their infringing activity. *Monsanto Chemical Co. v. Perfect Fit Products Manufacturing Co.*, 349 F.2d 389, 396–97 (2d Cir.1965), *cert. denied*, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966). Where the defendants fail to produce evidence to refute plaintiffs' evidence of defendants' sales of counterfeit products, the court must rely on less certain methods of proof. *Deering, Milliken & Co. v. Gilbert*, 269 F.2d 191, 193 (2d Cir. 1959). In *Deering*, the defendant was evasive and uncooperative, refusing to testify about the number of counterfeit products he sold. The district court, having found defendant's testimony "not worthy of belief," was forced to calculate damages based on indirect and circumstantial evidence. *Id.* at 193. We affirmed, stating that "where ... the defendant controls the most satisfactory evidence of sales the plaintiff needs only establish a basis for a reasoned conclusion as to the extent of injury caused by the deliberate and wrongful infringement." *Id.* We find it hard to imagine a better basis for the district court's "reasoned conclusion" than the defendants' own statements, fortuitously preserved on videotape. *See also Chesa International, Ltd. v. Fashion Associates, Inc.*, 425 F.Supp. 234, 238 (S.D.N.Y.) ("well-known and ancient doctrine" states that doubts about actual damages will be resolved against party who evades ascertainment of actual damages), *aff'd mem.* 573 F.2d 1288 (2d Cir.1977).

Moreover, the district court's conclusion is also supported by the language of section 1117: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." Plaintiffs here proved defendants' sales, using defendants' own words. The burden then shifted, requiring defendants to prove costs or deductions. Defendants failed to sustain their burden. In the absence of any evidence introduced by defendants, the court's reliance on defendants' videotaped statements as to their profits was not unreasonable.

Defendants' insistence that the court should have drawn adverse inferences against plaintiffs because they failed to produce Rochman to testify is unconvincing. Rochman was first alleged to be in Hong Kong or Korea and then in Arizona during the trial. Neither party attempted to obtain Rochman's testimony during this time, although the issue was the subject of some discussion during the trial. Defendants contend that Rochman's non-appearance should require the court to draw adverse inferences against plaintiffs because Rochman was within plaintiffs' "control," apparently because plaintiffs' attorney was a special prosecutor in a case in which Rochman was a defendant.

The district court correctly refused to draw any inferences from Rochman's absence. An inference against plaintiffs would arise only if defendant proved that plaintiffs had it "peculiarly within [their] power to produce" Rochman. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335, 1353 (7th Cir.1983). No such proof was made. Rochman was equally available, or unavailable, to both parties. The court did not err in refusing to hold plaintiffs responsible for Rochman's absence.

### C. *Admissibility of Videotape*

Defendants' contention that the court erred in admitting the videotape into evidence is frivolous. They claim that the tape was not properly authenticated and that the chain of custody was not established. Significantly, they do not argue that the tape was inaccurate in any way or that it had been altered since the date of recording.

The district court allowed the videotape to be played after hearing Weinberg's testimony that the tape accurately depicted the

**974**

events in the hotel room. J.App. at 45–48. Fed.R.Evid. 901(a) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Where, as here, no well-founded accusation of impropriety or inaccuracy is made, testimony as to authentication is sufficient. *See United States v. Richardson*, 562 F.2d 476, 479 (7th Cir. 1977), *cert. denied*, 434 U.S. 1072, 98 S.Ct. 1257, 55 L.Ed.2d 776 (1978); *Mikus v. United States*, 433 F.2d 719, 725–26 (2d Cir. 1970) (authentication testimony on motion pictures of bank robbery held sufficient); *cf. United States v. Brannon*, 616 F.2d 413, 416–17 (9th Cir.), *cert. denied*, 447 U.S. 908, 100 S.Ct. 2993, 64 L.Ed.2d 858 (1980) (evidence that bank surveillance photos accurately depicted events was sufficient foundation for introduction of photos). The district court did not err in admitting the videotape.

### CONCLUSION

The district court did not err in refusing to apply retrospectively the provisions of the Trademark Counterfeiting Act. Thus, we affirm the court's denial of plaintiffs' motion to amend the judgment. The district court's method of calculating damages was not clearly erroneous and the videotape was properly admitted into evidence. Finding defendants' other contentions meritless, we affirm the judgment of the district court.