SARA LEE CORPORATION Plaintiff,

v.

BAGS OF NEW YORK, INC.; New York New York Handbags, Inc.; Emil Saygh; and Nabil Helou a/k/a Billy Helou, Defendants.

No. 97 Civ. 0085 (CBM).

United States District Court, S.D. New York.

Jan. 28, 1999.

**162**

Samuel Slone Weissman, New York City, for New York, New York Bags, Inc. and Nabil Hedou.

*Opinion on Statutory Damages,
Attorney Fees, and Costs*

MOTLEY, District Judge.

Plaintiff Sara Lee Corporation ("Sara Lee") filed this action claiming that the defendants produced and sold counterfeits of trademarked products of Sara Lee's Coach Leatherware ("Coach") division, in violation of the Trademark Act of 1946, codified as amended at 15 U.S.C. § 1051, *et seq.* ("Trademark Act"). The defendants failed to answer the complaint and the court entered a default judgment in favor of Sara Lee granting injunctive relief and retaining jurisdiction to determine damages. After hearing and review of the filings and record, the court awards Sara Lee $750,000 in statutory damages and $46,045.63 in attorney fees and costs.

## I. Case Background

### A. Complaint to Default Judgment

Sara Lee, through its Coach division, designs, produces, and sells distinctive handbags, wallets, briefcases, and similar goods. The bags all share features that distinguish them as "Coach" bags, such as their glove-tanned leather, ornamental trim, and "Coach" hangtag suspended from a strap of the bag on a solid brass chain. These designs are trademarked and registered with the Patent and Trademark Office as United States Trademark Registration Numbers 751,493, 1,071,000, 1,070,999, 1,242,098, 1,309,-779, 1,746,836, 1,846,801.

On January 7, 1997, Sara Lee filed a complaint alleging that defendants, makers and sellers of bags similar to those Coach markets, impermissibly used Coach trademarks to sell their own products, in violation of the Trademark Act and state law. Following defendants' failure to appear or defend, Sara Lee obtained a default judgment on September 3, 1997. *See* Order of Default Judgment dated Sept. 3, 1997 ("Default Judgment").

Citing the Trademark Act, the Default Judgment featured injunctive relief and a monetary award to be fixed by the court. It ordered the defendants to destroy all infringing articles, enjoined the defendants from using the Coach trademarks or trade dress, and enjoined the defendants from evading these prohibitions by any means such as assignments, transfers, or formations of new entities or associations. *Id.* at 3–4. It also ordered the defendants to pay, in an amount to be determined by the court: the greater of treble damages or profits; statutory damages of up to $1 million per violation; and reasonable attorneys' fees and costs. *Id.* at 4.

### B. Damages Determination: Filings and May 19, 1998 Hearing

For its damages determination, the court on November 18, 1997 set a December 5, 1997 deadline for Sara Lee filings. Sara Lee sought the maximum statutory damages of $1,000,000 as well as attorney fees and costs. On April 16, 1998, after reviewing the Sara

Lee filings on damages, the court scheduled a damages hearing for May 19, 1998. After hearing, the court set a July 2, 1998 deadline for Sara Lee to submit findings of fact and conclusions of law on damages.

### 1. Testimony of Nabil "Billy" Helou

At the May 19, 1998 hearing, defendant Nabil "Billy" Helou attended and testified under oath that, as illustrated by the following timeline, he and his corporate co-defendants no longer were in business. Since the early 1980s, Mr. Helou had been in the handbags business at the same location, though under different corporate names. Tr. May 19, 1998 ("Tr.") at 95–100. He and his relatives ran the "Helou Brothers" corporation for seven or eight years during the early and mid–1980s. In the late 1980s, when a family split led to the dissolution of Helou Brothers, Mr. Helou formed the "New York, New York Handbags" ("NYNYH") corporation. Soon after, Mr. Helou then changed the business name to "Bags of New York" ("BNY") by dissolving NYNYH and forming BNY as a new corporation.

Mr. Helou then dissolved BNY in 1996 or 1997. Tr. at 102–103. He sold BNY's assets for roughly $2,500 to $3,000 to his girlfriend, Blanca Hernandez, who continues to operate there. Tr. at 112–114, 119. Mr. Helou then was "not involved" in the business on the old BNY premises, Tr. at 121, 129, although at times he would visit Ms. Hernandez and "help her" with sales or with closing the shop at night. Tr. at 120. His main work consisted of freelance jobs for others in the industry. Tr. at 129–130. In the past two years, he has had little income, especially since he plead guilty to charges of trademark counterfeiting in September 1996. Tr. at 132. He had taxable income of roughly $20,000 in 1996 and no taxable income in 1997. Tr. at 131–132.

### 2. Testimony of Sara Lee Investigators

At the May 19, 1998 hearing, Sara Lee offered the testimony of Gladys Vargas and Roger Noakes, private investigators it hired to make undercover purchases from the defendants on the BNY premises. Tr. at 18–20, 63–64. Four times between June and September 1996, Ms. Vargas purchased counterfeit Coach bags from Mr. Helou at BNY, each time spending an average of 30 minutes there. Tr. at 34. The premises included both a showroom and factory. Tr. at 19. In the showroom, Ms. Vargas, during each of her visits, observed densely packed racks that were fully stocked with several thousand bags. Tr. at 19–20, 48. In the factory, Mr. Noakes, accompanying police during a September 5, 1996 search and seizure, observed two large press machines that cut leather, several sewing machines, and five or six workers on duty. Tr. at 72–74.

In all four of Ms. Vargas's purchases, Mr. Helou sold her counterfeit Coach-trademarked bags, holding them out as copies of specific Coach products. Tr. at 18, 34, 36. The showroom racks and the BNY catalog identified their bags by Coach style numbers. Tr. at 19, 29–31; Pl.'s Ex. 5 (catalog). The price list accompanying the BNY catalog explicitly stated that "all styles pictured in catalog are Coach look-a-likes." Tr. at 55; Pl.'s Ex. 6 (price list). Mr. Helou also showed customers Coach catalogs and explained that he sold those items. Tr. at 21, 27.

During each visit, Ms. Vargas saw three or four customers making similar purchases, either looking through Coach catalogs or picking up goods. Tr. at 34. When a customer placed an order, Mr. Helou instructed factory workers to stamp the Coach look-alike bags with Coach trademarks and serial numbers. He then gave the customer the finished counterfeit Coach bags, each with a matching counterfeit Coach-stamped leather tag. Tr. at 25–26, 32, 47.

The median price of a bag on the BNY price list was $42: $39 for the bag and $3 for the accompanying tag. Pl.'s Ex. 6 (bag price list); Tr. at 32, 38 (tag price). Mr. Helou did not consistently provide Ms. Vargas regular receipts for her purchases. For example, in an August 1996 purchase, he provided an actual receipt. Tr. at 37, 41; Pl.'s Ex. 7 (receipt). In contrast, in a June 1996 purchase, he only wrote the price on the back of a business card. Tr. at 31–32.

### C. Ex Parte Seizure on May 28, 1998

Immediately after the May 19, 1998 damages hearing, Sara Lee applied for an ex parte seizure order, claiming continuing infringements. After a May 26, 1998 ex parte hearing, the court granted the order. On May 28, 1998, United States Marshals, accompanied by Sara Lee representatives, executed the order at the defendants' premises. The Marshals found Mr. Helou and his brother Fred Helou operating the business. Tr. June 1, 1998 at 3–8.

During the May 1998 seizure, the premises included not only finished counterfeits, but also Coach look-alikes and the stamping machinery to turn them into finished counterfeits. The Marshals seized the following: 174 counterfeit Coach handbags; 5,512 look-alike Coach handbags; 60 stamps and dies with Coach indicia for production of counterfeit Coach bags; and 996 look-alike and stamped Coach keyfobs. Decl. Brian W. Brokate Supp. Civil Contempt, June 16, 1998, ¶¶ 3–5; Tr. June 24, 1998 at 17–18; Tr. June 1, 1998 at 4. Mr. Noakes saw similar items during a September 5, 1996 police seizure: small leather tags and several stamps (dies) bearing various Coach trademarks that appeared on the tags. Tr. at 72, 78–80.

On June 1, 1998, the court held a hearing at which it ruled that the seizure should be confirmed. On June 16, 1998, the court issued a written seizure confirmation order. On July 15, 1998, the defendants moved to modify the seizure confirmation order, arguing changed circumstances and wrongful seizure because only 174 of the over 5,000 bags seized had a Coach logo stamped on them, while the rest only resembled Coach bags in "unregistered trade dress." At a hearing on September 17–18, 1998, the court denied the motion to modify the seizure.

### D. Order of Civil Contempt Against Defendants

At the June 1, 1998 hearing, Sara Lee requested that the court find the defendants in contempt of the Default Judgment for the continued counterfeiting that the seizure disclosed. On June 16, 1998, a show cause order scheduled a June 24, 1998 hearing on Sara Lee's motion for civil contempt. On June 24, 1998, after hearing, the court found that Nabil Helou, BNY, NYNYH, Fred Helou, Jolee Bags, and Midtown Bags and Accessories were in civil contempt of the Default Judgment. The order fined the defendants $25,000, jointly and severally, to be paid to Sara Lee on penalty of civil incarceration. After postponements, Mr. Helou paid the fine by the September 21, 1998 final deadline.

### E. Evidence of Continued Counterfeiting in Further Proceedings

On September 17–18, 1998, private investigators hired by Sara Lee testified that they observed and purchased counterfeit Coach products at BNY during the summer of 1998. On August 27 and September 14, 1998, Mark Kaspiev saw Mr. Helou and an inventory of Coach look-alike handbags at BNY. Tr. Sept. 18, 1998 at 65–68. On September 11, 1998, Frederick Kretsch participated in a confidential informant's purchase of ten counterfeit Coach bags from BNY for $835. Tr. Sept. 17, 1998 at 24–30. Mr. Helou denied the sale and asserted that bags he sold had lower prices averaging $32 to $55. Tr. Sept. 18, 1998 at 81–82, 87–88.

On September 29, 1998, Sara Lee filed, and this court signed, an order to show cause scheduling an October 7, 1998 hearing on a second Sara Lee motion for civil contempt based on these continuing violations of the Default Judgment. The defendants combined their opposition with a motion to modify the default judgment as to Coach "trade dress." Later orders rescheduled the hearing to November 18, 1998. On November 16, 1998, the court signed a stipulation and order in which Sara Lee withdrew its pending motion for civil contempt and the defendants withdrew their pending motion to modify the default judgment. The stipulation and order explicitly provided that Sara Lee's pending request for statutory damages remain before the court for decision.

## II. Findings of Fact and Conclusions of Law

### A. Availability of Statutory Damages as an Alternative to Traditional Damages

Sara Lee has exercised its option to seek statutory damages under the Anticounterfeit-

ing Protection Act of 1996 ("1996 Act"), Pub.L. No. 104–153, amending the Trademark Act at 15 U.S.C. § 1117(c):

> (c) In a case involving the use of a counterfeit mark ... in connection with the sale, offering for sale, or distribution of goods or services, the plaintiff may elect ... to recover, instead of actual damages and profits under subsection (a) of this section, an award of statutory damages for any such use in connection with the sale, offering for sale, or distribution of goods or services in the amount of—
>
> (1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just; or
>
> (2) if the court finds that the use of the counterfeit mark was willful, not more than $1,000,000 per counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the court considers just.

15 U.S.C. § 1117(c). This is an alternative to traditional awards based on actual losses under § 1117(a),(b). Under § 1117(a), a "plaintiff shall be entitled ... to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." Courts have discretion under § 1117(a) to increase the award to three times actual damages or to otherwise adjust the award, but only to "constitute compensation and not a penalty." Under § 1117(b), willful violations automatically merit treble profits or damages and attorney fees "unless the court finds extenuating circumstances." Unlike § 1117(a), which merely *permits* trebling of damages in the court's discretion, § 1117(b) *requires* trebling of damages upon a finding of willfulness, absent extenuating circumstances. Also unlike § 1117(a) is what the Second Circuit has termed "the punitive nature of the treble damages provision" under § 1117(b), which trebles damages not to compensate as under § 1117(a), but "to deter potential counterfeiters." *Louis Vuitton S.A., et al. v. Spencer Handbags Corp.,* 765 F.2d 966, 970 (2d Cir.1985).

█ These distinctions among § 1117(a),(b),(c) clarify the nature of § 1117(c) awards: § 1117(a) provides strictly compensatory relief; § 1117(b) provides strictly capped punitive relief; and § 1117(c) provides both compensatory and punitive relief without the strict limits of § 1117(a),(b). While § 1117(c) looks to compensatory considerations (e.g., actual losses and trademark value), it also looks to punitive considerations (e.g., deterrence of other infringers and redress of wrongful defense conduct). *See infra* Part II.B. Thus, damages inquiries under § 1117(c) and those under § 1117(a),(b) look to similar considerations but differ in that under § 1117(c), "there is no necessary mathematical relationship between the size of such an award and the extent or profitability of the defendant's wrongful activities" because § 1117(c) omits the strict limits on compensatory and punitive relief of § 1117(a),(b). *Gucci Am., Inc., et al. v. Gold Ctr. Jewelry, et al.,* 997 F.Supp. 399, 404 (S.D.N.Y.), *modified on other grounds,* 997 F.Supp. 409 (S.D.N.Y.), *rev'd on other grounds,* 158 F.3d 631 (2d Cir.1998). *See also, e.g., Playboy Enter., Inc. v. Universal Tel–A–Talk, Inc., et al.,* No. Civ. A. 96–6961, 1998 WL 767440, at *8 (E.D.Pa. Nov.3, 1998) ("[D]efendants did not have any profits and plaintiff has failed to prove actual damages. Nevertheless, ... plaintiff may elect to recover statutory damages.").

### B. Criteria for Statutory Damages Determination

#### 1. Broad Judicial Discretion in Setting Amount of Damages

█ Statutory damages are most appropriate when infringer nondisclosure during fact finding leaves damages uncertain. This problem motivated the enactment of § 1117(c) in the 1996 Act:

> The creation of this alternative to the more traditional damage remedies of recovery of the plaintiff's damages or the defendant's profits reflected a harsh reality—counterfeiters often do not keep or secrete records of their unlawful activities, thus making proof of the extent of the plaintiffs injury or the counterfeiters' profits impossible as a practical matter.

*Guess?, Inc. v. Gold Center Jewelry,* 997 F.Supp. 409 (S.D.N.Y.) (citing S.Rep. No. 177, 104th Cong., 2d Sess. (1995)), *rev'd on*

*other grounds,* 158 F.3d 631 (2d Cir.1998). The fact that infringer nondisclosure is a key reason for statutory damages explains why two of the three cases applying § 1117(c) are judgments against infringers who, after commencement of litigation, defaulted and continued their wrongdoing. *See Gucci Am., Inc., et al. v. Gold Ctr. Jewelry, et al.,* 997 F.Supp. 399 (S.D.N.Y.), *modified on other grounds,* 997 F.Supp. 409 (S.D.N.Y.), *rev'd on other grounds,* 158 F.3d 631 (2d Cir.1998); *Playboy Enterprises, Inc. v. Asiafocus Intern. Inc., et al.,* No. Civ. A. 97–834–A, 1998 WL 724000 (E.D.Va. Apr. 10, 1998).[1]

■ "The statute itself does not afford much guidance as to how the courts are to fix appropriate amounts in statutory damage cases." *Guess?, Inc. v. Gold Ctr. Jewelry, et al.,* 997 F.Supp. 409, 411 (S.D.N.Y.), *rev'd on other grounds,* 158 F.3d 631 (2d Cir.1998). The 1996 Act limited its textual guidance purposefully, however; it specifically provided for broad judicial discretion in instructing that "as the court considers just," it can order awards anywhere from $500 to $100,000, with the maximum increasing to $1,000,000 for "willful" violations. 15 U.S.C. § 1117(c)(1),(2). Because a key purpose of § 1117(c) is to provide a monetary remedy in cases of amorphous damage, courts assessing statutory damages must exercise discretion in examining whatever facts and considerations are available in a setting of limited information.

### 2. Analogy to Copyright Act Statutory Damages

In *Guess?, Inc. v. Gold Ctr. Jewelry, et al.,* 997 F.Supp. 409 (S.D.N.Y.), *rev'd on other grounds,* 158 F.3d 631 (2d Cir.1998), the District Court decided that because of the paucity of cases applying the relatively new 1996 Act, it would look to "an analogy [in] the Copyright Act[,] ... which provide[s] for awards of statutory damages for willful copyright infringement. Hence, cases decided under the Copyright Act, which deals with a similar problem and a similar legislative

grant of discretion, afford guidance here." 997 F.Supp. at 411 (citing 17 U.S.C. § 504(c)). The Copyright Act is not only similar in principle to the Trademark Act but identical in much of its statutory damages language. Both authorize determinations within a broad range "as the court considers just," 15 U.S.C. § 1117(c)(1),(2); 17 U.S.C. § 504(c)(1),(2), with the maximum increasing for "willful" infringements, 15 U.S.C. § 1117(c)(2); 17 U.S.C. § 504(c)(2).

■ While only three District Courts have interpreted § 1117(c) of the Trademark Act, the Second Circuit has had years to interpret the § 504(c) of the Copyright Act. *Fitzgerald Pub. Co. v. Baylor Pub. Co., et al.,* 807 F.2d 1110 (2d Cir.1986), noted several factors for courts to consider. First, the relevant factors include whatever dollar figures are available, such as "the expenses saved and the profits reaped by the infringers[,] ... the revenues lost by the plaintiff, ... [and] the value of the copyright." *Id.* at 1117. Second, "[s]ome factors do focus on an individual defendant's culpability, for instance, whether the defendant's conduct was innocent or willful, ... or whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced." *Id.* Third, "the deterrent effect on others besides the defendant ... [and] the potential for discouraging the defendant ... factor[ ] into the determination of the award" because "[a]wards of statutory damages serve two purposes—compensatory and punitive." *Id. Accord N.A.S. Import, Corp., et al. v. Chenson Enter., Inc.,* 968 F.2d 250, 252 (2d Cir.1992) ("[T]he 'statutory rule, formulated after long experience, not merely compels restitution of profit and reparation of injury but also is designed to discourage wrongful conduct.' ") (quoting *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 233, 73 S.Ct. 222, 97 L.Ed. 276 (1952)).

The second and third sets of factors distinguish statutory damages under § 1117(c) from traditional Trademark Act damages un-

---

1. There are only three recorded cases because the 1996 Act was enacted only on July 2, 1996, as Pub.L. 104–153, § 7, 110 Stat. 1388. The one case that was not a default judgment, *Playboy Enter., Inc. v. Universal Tel-A-Talk, Inc., et al.,* No. Civ. A. 96–6961, 1998 WL 767440 (E.D.Pa. Nov.3, 1998), found statutory damages to be an appropriate remedy for infringements that caused no proved actual damages. *Id.* at *8.

der § 1117(a),(b). Courts applying § 1117(a),(b) must base awards on actual losses, with limited upward flexibility. Under § 1117(a), increased awards still must constitute compensation, not a penalty; under § 1117(b), increased awards for punitive and deterrence purposes are limited to three times actual losses. In contrast, in interpreting Copyright Act language parallel to that in the 1996 Act codified as 15 U.S.C. § 1117(c), the Second Circuit has held that uncapped statutory damages under 17 U.S.C. § 504(c)(1),(2) may be punitive as necessary to deter the defendants, to deter others, and to redress wrongful litigation conduct. *See N.A.S. Import, Corp.*, 968 F.2d at 252; *Fitzgerald Pub. Co.*, 807 F.2d at 1117.

### 3. The Three 1998 District Court Cases Applying § 1117(c)

In the three existing § 1117(c) cases, District Court awards have paralleled the Copyright Act precedents. *Playboy Enter., Inc. v. Universal Tel–A–Talk, Inc., et al.*, No. Civ. A. 96–6961, 1998 WL 767440, at *8 (E.D.Pa. Nov.3, 1998), found no willfulness and awarded $10,000 in statutory damages. The other cases awarded sums of six or seven figures after finding the sort of aggravating circumstances the Copyright Act precedents establish as factors in statutory damages determinations. *See Playboy Enter., Inc. v. Asiafocus Int'l, Inc., et al.*, No. Civ. A. 97–834–A, 1998 WL 724000 (E.D.Va. Apr. 10, 1998) (awarding $3,000,000 with per-infringement statutory damage awards of $500,000 to $1,000,000); *Gucci Am., Inc., et al. v. Gold Ctr. Jewelry, et al.*, 997 F.Supp. 399, 400 (S.D.N.Y.) (awarding $275,000 with per-defendant statutory damage awards of $25,000 to $50,000), *modified*, 997 F.Supp. 409 (S.D.N.Y.) (decreasing award), *rev'd*, 158

F.3d 631 (2d Cir.1998) (reinstating original award).[2]

### C. Statutory Damages in the Present Case

■ The determination of a proper amount of statutory damages must look to the full range of factors discussed above. Though actual damages, such as profits and losses, are a typical starting point for analysis, they are difficult to determine here beyond rough estimates of the amount of counterfeiting. Moreover, the circumstances make especially salient the various non-monetary factors based on the defendants' misconduct. Mr. Helou, who controlled BNY and NYNYH, willfully infringed Coach trademarks for over two years, defying all attempts at deterrence and supporting the counterfeiting operation by concealing evidence and lying under oath repeatedly.

### 1. Willfulness of Infringements

The court agrees with Sara Lee that "the wilful activity of the defendants resulted in a methodical long-time operation of a counterfeit Coach factory knowing full well ... that what was being produced was unlawful to sell." Tr. at 7 (Brokate). Mr. Helou's sales pitch at BNY was that he sold counterfeit, not genuine, Coach products: the BNY price list stated that "*all* styles pictured in [BNY's] catalog are Coach *look-a-likes*," Tr. at 55; Pl.'s Ex. 6 (BNY price list) (emphasis added); the BNY catalog and showroom racks identified the BNY bags by Coach style numbers, Tr. at 19, 29–31; Pl.'s Ex. 5 (catalog); and Mr. Helou told customers that he could sell them items he showed them in Coach catalogs, Tr. at 21, 27. Further evidencing willfulness is Sara Lee's proof that the defendants persisted from at least June 1996 to

**2.** In this case, the District Court's original award was $25,000 or $50,000 from each of the nine defendants, depending on whether the defendant faced one or both of the plaintiffs. *See Gucci Am., Inc., et al. v. Gold Ctr. Jewelry, et al.*, 997 F.Supp. 399 (S.D.N.Y.1998). The District Court later reopened the issue of damages and decreased this award. *See Guess?, Inc. v. Gold Ctr. Jewelry, et al.*, 997 F.Supp. 409 (S.D.N.Y.1998) (decreasing award from $25,000 to $4,500). In response to the decrease, the Second Circuit "reverse[d] and order[ed] reinstatement of the

original monetary judgments[,] conclud[ing] that the district court erred in granting the motion to vacate the damages portion of the judgments." *Gucci Am., Inc., et al. v. Gold Ctr. Jewelry, et al.*, 158 F.3d 631, 635 (2d Cir.1998). The Second Circuit reversed only the decrease of the original award; it explicitly affirmed all other determinations of the District Court, such as the factual findings, the original statutory damages award, and the award of attorney fees. *See id.* ("In all other respects, the decision of the district court is hereby affirmed.").

September 1998 in the face of repeated and clear official determinations that their operations were illegal counterfeiting.

### 2. Efforts to Mislead and Conceal

The defendants concealed evidence and lied under oath to mislead the plaintiffs and the court. At every stage, Mr. Helou, through his sworn testimony and his counsel, protested that he had stopped committing any infringements, only to be caught again soon after:

- On May 19, 1998, Mr. Helou testified: "I am no longer in business.... I am no longer in the handbag business completely. Often I go visit the place to help the person that bought this business from me ... about a year" ago for "ten cents on the dollar" after Mr. Helou "dissolved the business." Tr. at 12–13.

- On June 24, 1998, counsel for Mr. Helou stated: "We come here with contrition.... The Bible says to forgive 7 times 70.... All I am asking the court at this point, your Honor, is to give us one opportunity finally to purge ourselves of this activity and allow these people to continue their business in a legal, proper manner.... [W]e intend to make sure that it will never occur again." Tr. June 24, 1998 at 13–14, 27 (Weissman).

- On Sept. 17, 1998, Mr. Helou testified to deny that he sold counterfeits to a Coach investigator a week earlier: "I have not done it.... I did not, and I swear to that." Tr. Sept. 17, 1998 at 94. Mr. Helou also emphatically protested that he now ran a legitimate business: "What I did before, it's crazy.... I didn't know what I'm doing. What I did then, it's not the same as now. I have learned a lot [and] ... took advice from you what is wrong, what is right.... I have changed dramatically. What I tell you now is the truth.... What I done before has nothing to do with what I'm doing now." *Id.* at 93–94.

The evidence repeatedly controverted Mr. Helou's repeated protestations, as the court has noted. At the June 24, 1998 hearing, the court noted that the May 28, 1998 seizure disproved Mr. Helou's May 19, 1998 testimony. The court stated, "He lied about a lot of

things.... [I]n other words it looks like he committed perjury here. He testified falsely under oath.... I think it's clear he testified falsely under oath." Tr. June 24, 1998 at 26–27. At the September 18, 1998 hearing, in response to Mr. Helou's efforts to dispute the evidence of his continuing counterfeiting, Tr. Sept. 17, 1998 at 24–30 (September 11, 1998 purchase); Tr. Sept. 18, 1998 at 65–68 (August–September 1998 observations), the court noted that he was "a witness I don't credit at all":

We heard all of this before from this witness about how he is not involved in this business, and he has been held in contempt and the seizure order was then confirmed. I have heard all of this before. I don't credit this man for one second. In my view, he is a completely incredible person. I have heard him many times here, and the evidence shows that he is continuing to do exactly what he was enjoined from doing and why his goods were seized. *Id.* at 93.

Active effort to mislead the court about continued willful counterfeiting is a traditional aggravating factor in statutory damages inquiries, including the one § 1117(c) determination in the Southern District. In *Gucci Am., Inc., et al. v. Gold Ctr. Jewelry, et al.,* 997 F.Supp. 399, 401 (S.D.N.Y.), *modified on other grounds,* 997 F.Supp. 409 (S.D.N.Y.), *rev'd on other grounds,* 158 F.3d 631 (2d Cir.1998), the District Court's § 1117(c) determinations considered that the defendants continued their infringements after receiving cease and desist letters, 997 F.Supp. at 401, and that a key defendant's "credibility is subject to serious question ... [and] conduct during the course of the litigation was entirely inappropriate," 997 F.Supp. at 411.

Affirmative efforts to mislead aside, the defendants have failed to provide evidence that would allow a more informed damages determination. Sara Lee reported that it "never received any response to discovery requests. These defendants kept little or no records as to sale and surely none which would allow a plaintiff to calculate the profits." Tr. at 9 (Brokate). It is not clear whether the defendants "kept little or no records," kept records but refused to disclose them, or, as at the September 18, 1998 hear-

ing, produced implausibly exculpatory purported records, Tr. Sept. 18, 1998 at 81–82, 87–88 (Mr. Helou denying selling 10 counterfeits for $835 by claiming that his bags cost $32 to $55). However limited their records, the defendants refused to provide even basic information such as cost and revenue estimates.

 The Second Circuit instructs that in determining infringement damages, courts are to resolve against the defendants any factual uncertainties, such as whether any portion of the defendants' revenue may be deducted from damages, when the defendants left the uncertainty by not responding to the evidence of counterfeit sales with evidence of their own. *See Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966 (2d Cir.1985) (holding that where defendant fails to produce evidence to refute plaintiff's evidence of counterfeit sales, court must rely on less certain methods of proof); *Deering, Milliken & Co. v. Gilbert*, 269 F.2d 191 (2d Cir.1959) (holding that where defendant produces no evidence of sales, defendant bears risk of uncertainty in damages determination relying on circumstantial evidence); *N.Y. Racing Ass'n, Inc. v. Stroup News Agency Corp.*, 920 F.Supp. 295 (N.D.N.Y.1996) (calculating lost profits based on gross figures where defendant failed to meet statutory burden to offer evidence of costs of goods sold).

### 3. Defiance of Attempts at Deterrence

The defendants' persistence in the face of extensive governmental efforts to end their counterfeiting business shows not only that they acted willfully, but also that they are difficult to deter. The evidence has shown that in late September 1998, the last time the court saw evidence, the defendants were continuing to operate their counterfeiting business. At that point, they had weathered two years of judicial action attempting in vain to end their counterfeiting. On September 5, 1996, the New York City Police Department executed a search and seizure on one BNY premises that resulted in the September 19, 1997 guilty plea of Mr. Helou to charges of second degree trademark counterfeiting in New York State Supreme Court. *See* Pl.'s

Mem. Supp. Statutory Damages, Ex. 1. On September 3, 1997, the defendants were enjoined from counterfeiting by the Default Judgment but have continued the same counterfeiting, in violation of that injunction and in spite of the seizure and contempt filings from May to September 1998.

Toward the goal of determining what size award might deter the defendants, an informative figure is the roughly $300,000 in money, goods, and equipment that proceedings in this case cost Mr. Helou and his business from May to September 1998. The seizure deprived the defendants of roughly $250,000 in goods and equipment, on the relatively conservative assumption that the sale price of the 5,512 bags seized would have been the old BNY price list median of $42, *see* Pl.'s Ex. 6 (bag price list); Tr. at 32, 38 (tag price), rather than the $83.50 average for the 10 counterfeits purchased on September 11, 1998, *see* Tr. Sept. 17, 1998 at 24–30. Mr. Helou also has paid a contempt fine of $25,-000 and, apparently, legal fees for multiple hearings and filings that aimed to protect his continued counterfeiting.

These losses did not deter Mr. Helou, which indicates that the counterfeiting operation is profitable enough for Mr. Helou to tolerate six-figure losses in order to continue it. "It is essential to deter infringements, and the only way courts can fashion a strong enough deterrent is to make infringers lose all profits from infringements." *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656 (2d Cir.1970). The defendants' perseverance through this barrage of sanctions shows that the barrage was too light to render their counterfeiting operation unprofitable.

### 4. Size of Counterfeiting Operation

Mr. Helou's operation was relatively large in scale, as his inventory of goods and equipment showed. In the showroom, the seizure disclosed an inventory of 5,512 bags worth at least $230,000 under conservative assumptions. In the factory, two private investigators observed a fairly elaborate production operation that included two large press machines for cutting leather, several sewing machines, and roughly five or six workers on duty. Tr. at 72–74 (Mr. Noakes); Tr. at 19

(Ms. Vargas). The operation is not only large, but long-term, as evidenced by the Sara Lee investigators who saw the operation from June 1996 to September 1998. In sum, the counterfeiting operation here has operated for years with inventory in the six figures, extensive machinery, and a staff of several production workers.

### 5. Amount of Statutory Damages

With an in-stock inventory of at least $230,000 in goods and an elaborate production operation, it is safe to estimate that the operation's sales of counterfeits yield income in the six figures. Uncertainties as to these figures are to be resolved against the defendants because they have failed to help clarify the exact dollar amounts, sales volume, or their costs. Continuous operation from at least mid–1996 to late 1998 thus would reflect two years and several months of six-figure annual income. Accordingly, purely compensatory relief would merit an award of $250,-000 as a reasonable estimate of the ill-gotten gains of the defendants, who failed to disprove the evidence supporting the estimate of a six-figure annual income.

Additionally, the high level of willfulness merits a trebling of the amount that would be appropriate as purely compensatory relief. If Sara Lee had sought actual damages rather than statutory damages, then trebling would have been automatic upon a finding of willfulness. Statutory damages give even greater weight to the need to deter and punish, so the same trebling of actual damages is an unadventurous corollary to the court's finding of willfulness. The failure of earlier, milder measures against the defendants highlight both the need for stronger deterrence and the need to redress the defendants' repeated efforts to defy and mislead the court.

If the $250,000 award necessary for purely compensatory relief is trebled, then the statutory damages award rises to $750,000. Even if the amount necessary for purely compensatory relief were somewhat lower than $250,000, an increase of the statutory damages award to $750,000 is in conformity with the precedents instructing that awards increase to deter and punish a willful contin-uous course of infringements and defiance of the judicial process.

### D. Attorney Fees and Costs

 The Default Judgment ordered the defendants to pay "reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117(b)." Awards of attorney fees for Trademark Act violations are appropriate in "exceptional cases" under § 1117(a) and for willful violations under § 1117(b), conditions that overlap significantly because "[t]he finding of willfulness determines the right to attorneys' fees.... 'Exceptional' circumstances include willful infringement." *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir.1995). *Accord Guess?, Inc. v. Gold Ctr. Jewelry, et al.*, 997 F.Supp. 409, 412 (S.D.N.Y.) ("Usually, the type of conduct that has sufficed to make out an 'exceptional case' is intentional, deliberate, or willful infringement." (quotation omitted)), *rev'd on other grounds*, 158 F.3d 631 (2d Cir.1998); *Playboy Enter., Inc. v. Asiafocus Int'l, Inc., et al.*, No. Civ. A. 97–834–A, 1998 WL 724000, at *9 (E.D.Va. Apr. 10, 1998) ("[D]efendant acted willfully and in bad faith in initiating and continuing their infringing activities despite notice from [plaintiff] and the commencement of this litigation. This case is therefore 'exceptional' ... and warrants the award of attorneys fees.").

 The broader question is whether a defendant's deliberate misconduct caused such unwarranted delay and expense for which the plaintiff deserves compensation. Accordingly, the sort of misconduct that supports an attorney fees award includes not only willful infringement, but also willful defiance and protraction of judicial processes attempting to stop the illegalities. The award of attorney fees stands under § 1117(a),(b) because both forms of misconduct are present here, as in *Guess?, Inc.*: "Here, the willfulness of the infringement is established. Moreover, defendant's conduct with respect to the litigation has caused needless expense for the plaintiff and unnecessarily consumed a great deal of the Court's time. In consequence, an award of attorney's fees is appropriate." 997 F.Supp. at 412. The Default Judgment's costs award also stands because § 1117(a) awards plain-

tiffs "the costs of the action" only "subject to the principles of equity" even without the higher showing of willfulness that justifies attorney fees.

The two submissions from Sara Lee attorneys sufficiently document fee requests that are reasonable for this case. *See* Decl. Thomas A. Smart Supp. Att'ys' Fees; Decl. Brian W. Brokate Supp. Att'ys' Fees. The hourly rates appropriately vary based on each attorney's standing and experience. *See* Smart Decl. at 5; Brokate Decl. at 5. The amount of work was not excessive under the circumstances, in light of the following considerations: the attorneys' ultimate success; the need for time-consuming investigation of the defendants' clandestine operations; and the culpability of the defendants for the past two years of extensive efforts to enforce the injunction against their counterfeiting. Accordingly, the court finds reasonable, and awards a recovery of, the requested $46,-045.63 in attorney fees and costs, divided between the $38,065.38 requested by Mr. Smart and the $7;980.25 requested by Mr. Brokate.

## III. Conclusion

For the above reasons, the court awards the plaintiff $750,000 in statutory damages as well as $46,045.63 in attorney fees and costs to be divided as per the attorney submissions. The defendants are liable on these awards jointly and severally.